Mr. Hogue. May it please the court, the district judge made three reversible errors in granting summary judgment. The testimony of KILOPASS witnesses raised genuine issues and material facts before any trial. First, she failed to find the space to park regions under the gate, quote unquote, that's required by the claim. Second, she found a disavowal, there was none. Then she compounded that error by extending a statement expressly linked to unique limitations in a dependent claim not contained in the independent claim and to the other patents. Then she found a violation of the local rule to exclude the core evidence of our doctrine of equivalence case where there was no violation, there was no change in theory, all that had been done were claim limitations added to the functional error disorder test. Maybe the most troubling part of this case for me needs a little comment from you and that is that the correction of the disavowal comes the day after the court drops the hammer on you and your client. Can you explain that timing? Yes, your honor. It doesn't matter what the timing is on that correction to her disavowal of the dependent claims because you can't expand such a statement to an independent claim when there's no global comments as required by the precedent of this court and the disavowal was false on its face. In other words, you're not responding to Judge Rader's question by giving a reasoning, you're just saying it wasn't a disavowal. It wasn't a disavowal. That wasn't Judge Rader's question. I thought your question, maybe I didn't understand it, your honor, was the timing. You do admit you made a mistake, right? Oh, absolutely. And the timing of that mistake admission is difficult. It comes right after you've just been slammed and then you change your mind. Can you explain that a little? We didn't change our mind. We found out about the mistake made by prosecution counsel, Carol Smith State, when we got the brief. And we had time, we began the process of looking into it to correct the patent office. The patent office is moving much slower. We had plenty of time there. We had to address the initial concern in the motion practice that there was in fact no disavowal. You couldn't extend it. But one of the things the trial court was clearly not impressed by is that you never argued mistake in front of the trial court. You simply tried to say that what you said either was meaningless or didn't say what it obviously seemed to say. And now all of a sudden it's a mistake after she ruled against you. It was a mistake ad initio when that was made. It was a careless mistake made by the prosecutor. It had to… But you concede you never made that argument to the trial court. Not initially, no. Exactly. We never thought there was a disavowal. We never believed there was a disavowal. We didn't believe under the law that you could extend a disavowal of a dependent claim to an independent claim that didn't have that limitation whatsoever. It didn't make any sense to us. The independent claim was completely, was distinguished during prosecution in the re-examination on a wholly different ground. Did you explain all this to the trial judge? Yes, absolutely we did. We have an antecedent basis in the record for that, your honor. Was disavowal argued during the trial? I'm sorry? Was disavowal argued during the trial? There was no underlying trial. It's a motion for summary judgment, your honor. And this disavowal occurred in the middle of expert reports being passed before the parties. There was no disavowal argued at trial whatsoever. There's been no trial. We would like to go to trial. We think that there's reversible error requiring us. We would ask remand back to the trial court so we can go to trial. Even if we agreed with you on disavowal, you still have a couple other problems. One of which is that we review the trial court's application of the local rules under an abusive discretion standard. She said you violated the local rules by not amending claims. Now I heard you say when you first stood up here that you thought that there wasn't a change in theory, but your own expert said there was. The expert said, first of all, he didn't comment on the original contentions because he came up with his own analysis. But there's no violation of the local rule. But he specifically said that his analysis is not consistent with the original contentions. Your Honor, I don't believe him saying that it wasn't inconsistent. I believe the record is that he didn't consider the original function, way, and result test in the contentions. Right, but then in follow-up questions he said he didn't consider it, but then in follow-up questions he agreed that it was not consistent with his. Isn't that a new theory then? It's not a new theory, Your Honor. We juxtaposed the function, way, and result tests on page 51 of our brief. You can line them up and read one right after the other, and there's no change in theory. They say the same thing. We can't see daylight between them at all. They all concern, each prong concerns the delineation of a conductor region named the channel and forming the end of it. They're all saying that. The only thing that was done with Professor Nykerk's report was that claim terms were added to the function, way, and result test. And that's it. That can't be new. That's something that they have been looking at since 2004. There's no defensive prejudice. There's no economic prejudice if there is any difference, which has to be very minor if you look at the formulations, because they had to take the depositions of the inventors and the chief technology officer anyway. That's it. There's no prejudice. It's actually impossible for there to be prejudice in this situation. But your own expert said that a channel stop was not the function that he felt was being carried out. So how do you have a totally different function? Your Honor, what we have is if you're going to compare a prong, the function prong of each report to each other, they don't make any sense. They don't exist in a vacuum. They have to be read in conjunction with the whole test. So, I mean, with the whole test, what you're talking about is the conductive region stop in the first prong. And then in the next prong, in the more recent formulation, is the end of the conductive region. A conductive region stop into the conductive region. Those are exactly the same formulations and functions. So that's, I mean, that's a fact. You can look at it for yourself. We don't see any change there. But more importantly, there's nothing in the case law concerning this expert, concerning this rule that requires any disclosure of function, weigh, and result. There's absolutely nothing. Everything in the case law, the case law that the judge cited, the supported decision, was a complete swap out of doctrine of equivalence for literal infringement. The rule says whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalence in the accused's instrumentality. That's what the rule says. It's beyond argument that we complied with the letter of that rule. On its face, we complied with that rule. There's been no change as far as that goes. So you're saying that that rule doesn't require explaining your theory of DOE? All you have to do is say it's a DOE theory? In every single application of the case law there, it is a complete swap out of doctrine of equivalence for literal infringement. And there's never been an issue. where your core evidence of infringement has been thrown out based upon a change in the wording of the function, weigh, and result test. It's wildly disproportionate. It's draconian and punitive. And it's unprecedented in the Northern District of California and in the Eastern District of Texas. It's never happened before. It's only happened to Killapass. And I bring in the Eastern District of Texas because it's the exact same rule. They use each other's case law and what this rule requires. Importantly, I think that the three errors are for doctrine of equivalence error on the local rule, for underlying analysis on the merits, completely violates Federal Circuit precedent, Supreme Court precedent. She had no analysis of the, no analysis whatsoever on the first DOE semi-conductor region. I'm going to reserve my time. You can save the rest of your time, Mr. Hogue. That will be fine, Mr. Cook. Please, the court. Just responding to a couple of Judge Rader's questions. To begin with, whether or not the question was about the correction or the timing of the correction with regard to the ruling on disavowal. In the reply brief, Killapass said that the disavowal was a sua sponte ruling by the court. But in fact, the disavowal claim was made in the opening papers. Now, a disavowal has to be clear and unmistakable. We really need kind of an emphatic proof of a disavowal. Is that going to be the case when you've got this ongoing dynamic re-exam process, where you can change positions, change claims? It's just a very different procedure. In that context, with the process still underway, is a single statement clear and unmistakable? I believe it is. In this case, very definitely. It was a clear statement of how Killapass interpreted this word-line, bit-line configuration claim limitation. In order to distinguish Tanaka. Yes. It was very clear that they were saying that our word-line, bit-line claims don't cover Tanaka. Mr. Hogan said, well, we were just referring to a dependent claim and limiting ourselves to a narrower context. I believe that they did that in a way to try and make it look minimal. But the Tanaka rejection was against every single claim of 751 in that there were, I think, 13 claims. The examiner applied Tanaka against all except claim 2. They were backed into a corner on this re-examination. They had lost the 757 re-examination. They lost the 540. And this one was hanging by a thread of this word-line, bit-line distinction. They had to do something before trial. And you're practicing Tanaka, or very close. Yes. It is Tanaka. So they had to do something. They had to get a new grounds of rejection. That's why they appealed their victory and said we need this susceptible claim limitation in there. And, oh, by the way, we do agree with the examiner. What else could they say? If they say they don't agree, then the validity appeal... Was Tanaka before the district court? In our invalidity contentions, yes. It certainly was before the district court in the disavowal. Yes. What about this issue on the local rule? I mean, certainly trial courts have broad authority to interpret their own rules, but it does seem to be just a generalized rule saying, you know, what claims do you argue are infringed and is it literal or DOE? The fact that they might have described their DOE differently, their argument is there's no prejudice because they never had to describe it in the first place. Well, there's two ways to add two answers to that. The first is that they did make an infringement contention, and they amended it without permission. Rule 3.3-6 says you must get permission before you amend. They did. It's clear that they amended without permission, and that's what the judge found was a violation. They tried to excuse themselves for not getting permission by saying we never had to do it in the first place. But the court rules are very clear. I certainly disagree with Mr. Hogue on his interpretation of that rule. If you look at the Duraflame and Implicit Networks cases, they say very clearly that you need an element-by-element analysis showing why and how the doctrine of equivalence applies, and those cases are the best authority on that subject. What's your response to his contention that they really aren't different? That's very hard to swallow. Professor, the channel stop infringement contention specifically said that the purpose was to prevent electrical current from flowing in the region occupied by the first doped semiconductor region. We asked Professor Nykerk to explain his new theory, and we asked him questions about electrical. He said electrical is not relevant. In fact, that same argument was made in the briefing as well. Electrical properties are not relevant. In fact, that's what they argue now as a defense to the function-way result, that we've talked about the electrical properties. They're not relevant. So they were clearly at odds. The Nykerk theory is clearly at odds with their channel stop theory. Do you mind if I turn to the motions in Lemonet for a minute? With respect to the motions in Lemonet, as it relates to the false advertising claim, as I understand it, trial courts said they couldn't go forward with their false advertising claim because the jury would be in a position of having to interpret the patent. But in a context of a tort where there's no infringement allegation, what's wrong with the jury interpreting the patent? Well, we believe that when there's a false advertising claim, the question is whether or not the claims read on the sidence product, the patent claims read on the sidence product. We think that by analogy, the false advertising claims for the patent law are guidance. We think that those same rules should apply. Yeah, but you didn't move for summary judgment and say, judge, no reasonable jury would ever say that this patent reads on this product or that our claim that we had a patent for this product would be false. You didn't do that. You said, motions in Lemonet, you can't present any evidence at all of your false advertising claim because that would require some analysis of the patent by the jury. But that doesn't, I mean, that's comparing apples to oranges. The false advertising claim at that time was as pled. And the pleading was that sidence has no patents covering its 1T fused logic NVM IP, IP, intellectual property. That's what sidence sells is its intellectual property. It sells a circuit that you can put on your chip, your smartphone chip. This is a memory circuit, and it comes complete with memory cells and a memory core, decoders and sense amplifiers. That's their intellectual property. So we have 40, sidence has 40 patents to say that the trial as it was ready to go at the time of the pretrial conference and the motions in Lemonet was that all we had to do was show that we had some patents covering this, which we did. We had 40 patents covering the technology. The idea that this particular patent didn't cover this particular memory cell only came up in the pretrial conference. They wanted to limit the claims to that. If they had limited those claims before, we would definitely have put in an expert report on it. We would have asked for claim construction, but we believe those claims do cover the memory cell. But even without it, there are Canadian claims that don't have the limitation of the sense amplifier that they rely on. Mr. Hogue mentioned that there are no preclusion cases where the patent owner was precluded from putting on its case because of violation of the local rules. The Rambis and the Genentech cases are such cases. They are not specific to this particular, but the obligation of the right of the district court to preclude putting on a theory is beyond question. The O2 micro case of this court has explained why that's the case. What about the space to part issue? I understand that there was a stipulated construction, but that stipulated construction was only to a portion of the claim. There was a lot more in that claim that seems to be lost in the district court's analysis. In other words, the claim itself only talks about being spaced apart for purposes of forming a channel. So wouldn't a fair argument be that as long as they're spaced apart to the extent that they form a channel, they don't have to be spaced apart for all purposes? Well, I don't think so. What they're arguing, the argument that Mr. Hogan has made here, is that they were not spaced apart under the gate. They were not in physical contact under the gate. And what that really tries to do is say that the STI is either not in the memory cell, or it is in the memory cell. They're arguing that the STI, where it is in contact, is not under the gate. And the rest of the STI that they rely on is defining the channel. There's no basis for dividing up the STI. The STI is a monolithic structure. And so I don't think they can have it both ways. Either the STI is in physical contact, which it is, or, in other words, it's in physical contact because it's part of the memory, or it is not part of the memory, in which case they can't use it for the doctrine of equivalence analysis. The first doped semiconductor reason has to be part of the memory cell in order to be used for STOE. I'm sorry? It has to be part of the memory? It's part of the memory cell. The first doped semiconductor region is an element of the claim to the programmable memory cell. So that, if you're going to put it in the... Yeah, it's in the claim, but it's really just a relic from the old transistors, right? I mean, there's really no reason for it. That's why you took it out. Well, there is a reason for it. The reason for it is to avoid, to make the memory cell smaller. There's extensive testimony on that, and I think footnote 13 of our brief. So, I think that's our answer to your question. So, I believe I've answered all of the questions that arose in this hearing. Thank you, Mr. Cook. Thank you very much, Mr. Holt. Mr. Holt, in light of this record, don't you either have an absence of infringement, because they're practicing prior art with a valid patent, or an invalid patent under Tanaka? No, first of all, that isn't here. That isn't here, but I'm looking at the record and asking myself, why are we doing this? Tanaka's distinguished in the... First of all, we are winning the 751 re-exam. We're not on the ropes. The erroneous statement was made in an appeal brief. There's never been a rejection of any of the 751 claims over Tanaka at the Patent Office. The distinction over Tanaka has to do with the near limitation in Claim 1 of the 751, because Tanaka shorts or blows a fuse only to the source, so they have the full range of the channel region when they're operating their bid cell. Excuse me, I'm going to grab the claim real quick. Can you tell me again, what is it that gets you... I've got it in front of me. What gets you around Tanaka? Tanaka is obtained around the limitation at the bottom of Claim 1 of the 751. It is more susceptible to breakdown near the first doped semiconductor region than said second doped semiconductor region. The first doped semiconductor region is the dead part of the cell. There's no electric current going through the first doped semiconductor region in our invention. So it's a shorting to the channel near the first doped semiconductor region. Tanaka shorts to the source, only to the source, and it's very clearly stated on page A5153 of the record, column 2, lines 10 through 15. It is a main object of the present invention to easily break down a gate insulating film, which is provided just below the gate electrode of a transistor only in a source portion. On the obviousness part of that issue is that we use a fraction of the voltage to program and read. A programming voltage in Tanaka is 20 volts on the gate. Programming voltage in our patent is on the order of 6 to 8 volts. And the read voltage to turn it on, you have to turn on the full transistor in Tanaka, and it's 5 volts to turn on our transistor once the fuse has been blown. It's 1.8 volts. That's the argument on the distinction over Tanaka. They're vastly different. Not to mention the fact that, in actuality, our first doped semiconductor region is a drain, it's not a source, and it goes on and on. We fully argued that to the Patent Office, that distinction, and that distinction is going to be discussed with the Board of Patent Appeals shortly. All right, so assume we find that there's no disavowal, and we're willing to go back in to the claim construction. Part of my problem is that nobody really focuses on what the correct claim construction should be. Are you going back and saying that the trial court's orthogonal claim construction is the one that you want? Nobody's objected to that claim construction. They've not taken a cross-appeal on it, and so it stands as it is right now. If you look at Independent Claim 1, there is no connection anywhere to a gate, but on the disavowal, the dependent claim says that the gate has to be formed from one of said bit lines, or something to that effect. Isn't the real point here, I'm not sure about this orthogonal stuff, but isn't the real point here what the lines do, the function of the lines? Absolutely, Your Honor. Like a road by any other name? The patent teaches to program and read voltage go down on the gate, and that you keep the second-dose semiconductor region zero volts for your read and programming, and that's what the patent teaches. So the point is what line you're reading from, right? It doesn't matter. In this technology, this is unconventional technology, it's not conventional memory. There's current on the gate. Once the current flows in this shortened channel period, there's current on the gate, and there's current over in the second-dose semiconductor region. You can sense the current from either line. That's why in the patent, the definitions are that you can swap the labels in this particular order. You're sensing the existence of some current, but wouldn't there be current coming from two different locations, possibly? The nature of current, Your Honor, is that wherever it flows from point A to point B, you can always sense it wherever it flows, and I see that my time is up. At an end, we ask that the district court be reversed and the case remanded to the trial court for trial. Thank you, Your Honor. Thank you. That concludes our morning.